IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br><br><br>        vs.<br><br><br>JOSEPH FLEMING PORTER,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br><br><br>Case No. 2:06-CR-119 TS |

Defendant filed this Motion to Suppress Evidence on May 1, 2006.[1]  An evidentiary hearing was held on the Motion on July 11, 2006.  Defendant filed a Memorandum in Support of Motion to Suppress Evidence on August 22, 2006,[2] and the Government filed a Memorandum in Opposition to Defendant's Motion to Suppress on September 22, 2006.[3]

---

[1]Docket No. 13.

[2]Docket No. 27.

[3]Docket No. 32.

## I.  FACTUAL BACKGROUND

On the afternoon of February 15, 2005, Officer Irvine ("Irvine") responded to a 911 call regarding an assault by a man with a gun at a Salt Lake City residence.  The caller ("Caller"), had told dispatch that a man named Johnson Smith Porter (later identified as Defendant) pulled a gun on her and that another woman had subsequently taken the gun and placed it in a front bedroom of the residence.  Caller also gave dispatch a physical description of Defendant and stated that he had been drinking.  Caller further stated that Defendant, and the woman who was with him, had just been released from prison.  She stated that Defendant had been serving a sentence pursuant to a murder conviction.  At the time of the call, Caller told dispatch that she had left the area, but that she would return to meet officers.  Later, Caller made a second call to dispatch, in which she communicated that she was waiting in a tan vehicle in the driveway of the residence, and requested that an officer call her.  Dispatch subsequently clarified that the name of the man who had allegedly pulled the gun was actually Joseph Fleming Porter.  Dispatch relayed all of this information to officers prior to their arrival at the residence.

Upon being contacted by dispatch, Irvine recognized the names of both Defendant and Caller.  Irvine remembered Defendant from having responded to his address several times.  In particular, Irvine remembered an incident six months earlier, where he responded to a report that Defendant had used a baseball bat to break a man's window.  Irvine recalled that he had learned during that incident that Defendant had been in prison before, and that he acted in a belligerent manner towards officers.  Irvine also knew that the residence to which he was responding was

located in what is known to be a high drug traffic area with a high crime rate.  Irvine knew Caller because she was often involved in trouble.

Irvine arrived at the residence, and noticed that there was no tan vehicle on the scene.  He waited for backup.  Officers Zubal, Sipes, and Hendricks arrived, and Hendricks went the rear of the residence.  Irvine knocked on the door, and Defendant answered shortly thereafter, partially opening the door.  Irvine noticed movement and heard people talking behind Defendant, leading him to believe that there were more people inside the residence.  Irvine began asking Defendant questions, and Defendant became upset.  Irvine noticed that Defendant's left hand was not visible.  Irvine asked to see Defendant's left hand at least twice.  Defendant refused.  Defendant repeatedly glanced to his left.  Irvine, glancing in the direction Defendant was, noticed a baseball bat through an opened crack on the hinge side of the door.  Upon so noticing, Irvine grabbed Defendant's right hand, pulled him onto the porch, placed handcuffs on him, and patted him down for weapons.

The officers then observed a black female and a white female inside the home.  Zubal and Sipes entered the house.  While Sipes watched the two females in the front room, Zubal went directly to the bedroom to the right of the front door.  Zubal immediately noticed the butt of a gun sticking out of a bag on the right side of the bed in the room.   Sipes then searched the rest of the home.

The officers did not have a warrant.  Defendant, a convicted felon, was charged with unlawfully possessing the firearm found in the bedroom.

3

## II.  DISCUSSION

Defendant has moved to suppress the firearm found in the bedroom on February 15, 2005.  Specifically, Defendant argues that his Fourth Amendment rights were violated when officers pulled him from the threshold of his home, and when they subsequently entered the home to conduct the search without a warrant.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated."[4]

> [S]earches and seizures inside a home without a warrant are presumptively unreasonable. . . . Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions. . . . [W]arrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.  One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury.[5]

The Government relies upon this exigent circumstances exception as the sole basis for conducting their search and seizure.[6]

---

[4]U.S. Const. Amend. IV.

[5]*Brigham City v. Stuart*, 126 S.Ct. 1943, 1947 (2006).

[6]In his brief, Defendant argues against the application of several other exceptions to the warrant requirement.  Docket No. 27, at 5-9,13-18.  Plaintiff concedes as to Defendant's arguments regarding the other exceptions.  Docket No. 32, at 7.  Notably, to the extent that Defendant argues against the "safety" exigency exception, Docket No. 27, at 9-13, his analysis is incorrect as it addresses the issue prior to the Supreme Court's decision in *Brigham City*, 126 S.Ct. 1943, which clarified this exception.

The test to determine whether exigent circumstances exist in this context consists of examining "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable."[7]  The Court will therefore proceed by examining these two factors.

First, as to the immediate need factor, "[w]e evaluate whether the officers were confronted with reasonable grounds to believe there was an immediate need guided by the realities of the situation presented by the record from the viewpoint of prudent, cautious, and trained officers."[8]  Importantly, officer responses to 911 calls are usually indicative of immediate need.[9]  For example, in *United States v. Najar*, officers arrived at a residence in response to a 911 call where the caller had hung up before conveying any information.[10]  Return calls by the dispatcher could not establish contact with the caller/occupant.[11]  The defendant was not cooperative with police when they arrived, as he lied either about making the call or about being the only occupant.[12]  The Tenth Circuit upheld the officers' search of the residence, stating that

---

[7]*United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006).

[8]*Id.* at 718-19.

[9]*See id.* at 719 ("Such calls are distinctive in that they concern contemporaneous emergency events, not general criminal behavior.") (quotation and citation omitted).

[10]*Id.* at 712.

[11]*Id*.

[12]*Id.* at 720.

"[g]iven the totality of the circumstances, the officers had reasonable grounds to believe someone inside the trailer may have been in need of emergency aid and immediate action was required."[13]

In this case, officers were responding to a 911 call which indicated an immediate need to protect lives because it purported to relate to an assault by a man with a gun.  The call indicated an immediate need at least as great, if not greater than, the call in *Najar*, as it communicated specific information regarding a specific threat of violence.  Furthermore, officers knew that they were responding to a call:  by a caller who was known by them as person who frequently got into trouble; at the residence of a known and potentially violent convicted felon; in an area with a reputation for drug traffic and crime.  Moreover, like the defendant in *Najar*, Defendant here was uncooperative once officers arrived, refusing to show them his left hand, despite repeated requests, and otherwise acting in a belligerent manner.  In this context, Defendant's glances towards the bat could reasonably be interpreted as deliberation as to whether he should attack the officers.  Accordingly, the Court finds that a prudent, cautious, and trained officer would have acted as Irvine did, grabbing Defendant before he had a chance to act.

Given that officers were unable to locate the caller, who was expected to be at the residence at the time of their arrival, and that they could hear and see individuals in the residence where a firearm was allegedly located, the officers had reasonable grounds to believe that someone inside the residence may have been in need of emergency aid and that immediate action was required.  Additionally, officers had reasonable grounds to believe that the individuals inside the residence had access to a firearm, and posed a threat to officer safety because of their

---

[13]*Id.*

association with Defendant, and because of the nature of the arrest.  Accordingly, given the totality of the circumstances, the officers had an objectively reasonable basis to believe there was an immediate need to protect the lives or safety of themselves or others, both in forcibly removing Defendant from the threshold of his home, and in subsequently entering the home to conduct a search.

Second, "[w]hile the first factor considers whether there is a reasonable basis to believe an emergency exists, the second factor necessarily deals with the manner and scope of the search."[14]  In *Najar*, the Court upheld a search where officers "did not attempt to search any place beyond the locations where a victim might likely be found" and "search[ed] . . . only those places inside the home where an emergency would reasonably be associated."[15]

Here, the manner and the scope of the search were reasonable.  Defendant was pulled from his home, handcuffed, frisked, and briefly detained while officers quickly found the gun which related to the original 911 call, and ascertained the situation within the home.  By that point, officers had probable cause to arrest Defendant, as a gun was found in plain view.  Moreover, the officers confined their search to areas where a victim might likely be found, and only those areas inside the home where an emergency would reasonably be associated.

### III.  CONCLUSION

Based upon the above cited facts and applicable case law, the Court finds that the exigent circumstances exception to the warrant requirement applies in this case.  It is therefore

---

[14]*Id.*

[15]*Id.*

ORDERED that Defendant's Motion to Suppress Evidence and Statements (Docket No. 13) is DENIED.  The firearm found at Defendant's residence is admissible.  It is further

ORDERED that the time from the filing of the Motion to Suppress, May 1, 2006, through the trial date of January 29-30, 2007, is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. §§ 3161(h)(1)(F) and (J).

DATED   October 4, 2006.

BY THE COURT:

_____

TED STEWART
United States District Judge